**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| MARTIN KENNEY and GARRETT | ) No. 2:17-Cr-0073-PD-1 |
| KELLEHER, | ) |
| | ) Hon. Paul S. Diamond |
| Defendants. | ) |
| | ) |

# DEFENDANT MARTIN S. KENNEY'S
# <u>MOTION TO DISMISS</u>

Patrick J. Egan
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2000 (Phone)
(215) 299-2150 (Fax)

*Attorney for Defendant*

*Martin S. Kenney*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... IV

GLOSSARY OF TERMS ........................................................................................... IX

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 3

I.   INSURANCE COVERAGE CASES AND CONFLICTING
     JUDGMENTS. ...................................................................................................... 3

II.  1999 SALE OF LIBERIAN LIABILITIES TO ACE. ........................................ 4

III. 2001 U.S. INJUNCTION. .................................................................................... 5

IV.  2002 LIBERIAN INJUNCTION. ......................................................................... 6

V.   EVENTS PRECEDING CONTEMPT CLAIM. ................................................... 8

     A.   Kenney has no relevant contacts with Pennsylvania. ............................ 8

     B.   Kenney and his law firm represented AJA from December 2003 to
          March 2006 and CCI from March 2006 to April 2007. ......................... 9

     C.   In April 2007, the Liberian Insurance Commissioner retained
          Kenney to pursue CIGNA's remaining assets. ..................................... 10

     D.   The Cayman Action and initial motion for contempt. ......................... 11

VI.  CIVIL CONTEMPT PROCEEDINGS. ............................................................. 13

     A.   Third Circuit ruling and State Department opinion. ............................ 13

     B.   CIGNA's May 2012 contempt motion and jurisdictional discovery. ... 14

     C.   CIGNA's February 2015 contempt motion. ......................................... 15

     D.   The ruling on the contempt motion and order to appear. ..................... 15

     E.   The December 14, 2016 hearing and Criminal Contempt Notice. ....... 17

ARGUMENT ............................................................................................................. 18

i

I.   THE UNDERLYING ORDERS WERE TRANSPARENTLY INVALID, BECAUSE THE DISTRICT COURT DID NOT HAVE AUTHORITY TO COMPEL DEFENDANTS TO PERSONALLY APPEAR. ...................................... 18

    A.   The Court did not have authority to compel Defendants to appear under Rule 45. ...................................................................................... 18

    B.   The Court did not have inherent authority to compel Defendants to appear. ................................................................................................... 19

II.  THE COURT LACKED PERSONAL JURISDICTION OVER KENNEY. ................... 21

    A.   Applying the super-contacts theory to Kenney, a foreign nonparty who acted abroad, violates due process. ............................................... 21

        1.   The super-contacts theory applies only to U.S. citizens and domestic conduct. ................................................................................................ 22

        2.   Extending the super-contacts theory to foreign nonparties acting abroad violates due process. ...................................................... 24

        3.   To find personal jurisdiction over Kenney, the Court used an unprecedented hodgepodge of jurisdictional tests. ................................... 26

    B.   Kenney, a nonparty, acted in good faith and therefore cannot be held in contempt. ...................................................................................... 28

    C.   The Court exceeded its power when it expanded the super-contacts theory to cover foreign nonparties acting abroad. ................................. 32

III. THE COURT LACKED DIVERSITY JURISDICTION. .................................................. 33

    A.   The Court did not retain ancillary jurisdiction to rule on CIGNA's 2001 injunction motion, so an independent basis of subject-matter jurisdiction was required. ..................................................................... 34

    B.   CIGNA was a merely nominal party; the real party was ACE, a foreign entity. ........................................................................................ 37

IV.  KENNEY AND OTHER RESPONDENTS WERE ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY, WHICH DEPRIVED THE COURT OF SUBJECT-MATTER JURISDICTION. ...................................... 40

    A.   The Commissioners enjoyed sovereign immunity for acts taken in their official capacities, and Kenney along with them. ......................... 41

    B.   The Commissioners acted in their official capacities under Liberian law. .................................................................................................... 42

C.     The Court failed to consider Liberian law in deciding whether the Commissioners were acting in their official capacities. ....................................... 43

CONCLUSION ............................................................................................................. 44

CERTIFICATE OF SERVICE ..................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airlines Reporting Corp. v. S and N Travel, Inc.*,
   58 F.3d 857 (2d Cir. 1995) ................................................................................... 39

*Alderwoods Grp., Inc. v. Garcia*,
   682 F.3d 958 (11th Cir. 2012) .............................................................................. 22

*Alvarado v. Table Mountain Rancheria*,
   509 F.3d 1008 (9th Cir. 2007) .............................................................................. 36

*Arkansas Blue Cross & Blue Shield v. Little Rock Cardiology Clinic*,
   551 F.3d 812 (8th Cir. 2009) ................................................................................ 36

*Broyles v. Bayless*,
   878 F.2d 1400 (11th Cir.1989) ......................................................................... 38, 39

*Cetacean Research v. Sea Shepherd Conservation Soc'y*,
   774 F.3d 935 (9th Cir. 2014) ................................................................................ 27

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) ........................................................................................... 19, 20

*ClearOne Commc'ns v. Bowers*,
   651 F.3d 1200 (10th Cir. 2011) ............................................................................ 22

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ............................................................................................ 25

*Dresser Indus., Inc. v. Underwriters at Lloyd's of London*,
   106 F.3d 494 (3d Cir. 1997) ............................................................................. 34, 40

*Eli Lilly & Co. v. Gottstein*,
   617 F.3d 186 (2d Cir. 2010) .................................................................................. 22

*Ex parte Robinson*,
   86 U.S. 505 (1873) ................................................................................................ 19

*Gambone v. Lite Rock Drywall*,
   288 F. App'x 9 (3d Cir. 2008) .............................................................................. 37

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) .................................................................................. 25

iv

*Gucci America, Inc., et al. v. Weixing Li, et al.*
    135 F. Supp. 3d 87 (S.D.N.Y. 2015) ................................................... 25

*Guiuan v. Villaflor*,
    544 F. App'x 64 (3d Cir. 2013) ...................................................... 36, 37

*Heaney v. Spain*,
    445 F.2d 501 (2d Cir. 1971) ................................................................. 42

*In re Eskay*,
    122 F.2d 819 (3d Cir. 1941) ............................................................. 2, 32

*In re Linerboard Antitrust Litig.*,
    361 F. App'x 392 (3d Cir. 2008) ........................................................ 36

*In re Novak*,
    932 F.2d 1397 (11th Cir. 1991) ................................................... 2, 18, 34

*In re Providence Journal Co.*,
    820 F.2d 1342 (1st Cir. 1986) ...................................................... passim

*In re Terrorist Attacks on September 11, 2001*,
    122 F. Supp. 3d 181 (S.D.N.Y. 2015) ................................................. 40

*In re Vaso Active Pharm., Inc.*,
    514 B.R. 416 (Bankr. D. Del. 2014) .................................................. 30

*In re Walters*,
    868 F.2d 665 (4th Cir. 1989) ............................................................. 30

*Johnson v. Big Lots Stores, Inc.*,
    251 F.R.D. 213 (E.D. La. 2008) ......................................................... 20

*Johnson v. Smith Kline Beecham Corp.*,
    724 F.3d 337 (3d Cir. 2013) .............................................................. 38

*Karaha Bodas Co. v. Perusahaan*,
    500 F.3d 111 (2d Cir. 2007) .............................................................. 37

*Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659 (2013) ......................................................... 19, 32, 33

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) .......................................................................... 35

*Liquid Glass Enters., Inc. v. Liquid Glass Prods. Int'l, Inc.*,
    1991 WL 286953 (E.D. Pa. Oct. 8, 1991) .......................................... 27

v

*M&C Corp. v. Erwin Behr GmbH & Co., KG,*
   508 Fed. App'x 498 (6th Cir. 2012) ............................................... 27, 28

*Matthews v. Spangenberg,*
   15 F. 813 (S.D.N.Y. 1883) ............................................................... 30

*Morris v. City of Hobart,*
   39 F.3d 1105 (10th Cir. 1994) .......................................................... 36

*Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010) ......................................................................... 33

*Navarro Sav. Ass'n v. Lee,*
   446 U.S. 458 (1980) ................................................................... 37, 38

*Oscar Gruss & Son, Inc. v. Hollander,*
   337 F.3d 186 (2d Cir. 2003) ............................................................. 38

*Owen Equip. & Erection Co. v. Kroger,*
   437 U.S. 365 (1978) ......................................................................... 35

*Paramedics Electromedicina Comercial, Ltda. v. GE Medical Systems Information Technologies, Inc.,*
   369 F.3d 645 (2d Cir. 2004) ............................................................. 27

*Peacock v. Thomas,*
   516 U.S. 349 (1996) ................................................................... 35, 37

*Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.,*
   426 F.3d 580 (2d Cir. 2005) ............................................................. 44

*Reebok Int'l Ltd. v. McLaughlin,*
   49 F.3d 1387 (9th Cir. 1995) .................................................... passim

*Republic of Austria v. Altmann,*
   541 U.S. 677 (2004) ......................................................................... 43

*Republic of Philippines v. Westinghouse Elec. Corp.,*
   43 F.3d 65 (3d Cir. 1994) ........................................................... 28, 33

*Rishikof v. Mortada,*
   70 F. Supp. 3d 8 (D.D.C. 2014) ....................................................... 40

*RJR Nabisco, Inc. v. European Cmty.,*
   136 S. Ct. 2090 (2016) ............................................................... 19, 33

*Scelsa v. City Univ. of N.Y.,*
   76 F.3d 37 (2d Cir. 1996) ................................................................. 36

*SEC v. Homa*,
514 F.3d 661 (7th Cir. 2008) ........................................................... 23, 32

*Security Pac. Nat'l Bank v. Derderian*,
872 F.2d 281 (9th Cir. 1989) ................................................................ 40

*Sheldon v. Shill*,
49 U.S. 441 (1850) ................................................................................ 19

*Slater v. Republic-Vanguard Ins. Co.*,
650 F.3d 1132 (8th Cir. 2011) .............................................................. 39

*Strotek Corp. v. Air Transp. Ass'n of Am.*,
300 F.3d 1129 (9th Cir. 2002) .............................................................. 39

*The Schooner Exchange v. M'Faddon*,
11 U.S. (7 Cranch) 116 (1812) (Marshall, C.J.) .................................. 33

*Underwriters at Lloyd's, London v. Osting-Schwinn*,
613 F.3d 1079 (11th Cir. 2010) ............................................................ 39

*United States v. KS & W Offshore Eng'g, Inc.*,
932 F.2d 906 (11th Cir. 1991) .......................................................... 2, 30

*United States v. Providence Journal Co.*,
485 U.S. 693 (1988) ............................................................................... 1

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) ............................................................................. 21

*Waffenschmidt v. MacKay*,
763 F.2d 711 (5th Cir. 1985) ...................................................... passim

*Walden v. Fiore*,
134 S. Ct. 1115 (2014) ......................................................................... 27

*Walker v. City of Birmingham*,
388 U.S. 307 (1967) ........................................................................ 1, 18

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ............................................................................. 21

*Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*,
167 F. Supp. 2d 743 (E.D. Pa. 2001) .................................................. 5, 6

*Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*,
899 F. Supp. 1385 (E.D. Pa. 1995) ........................................................ 4

vii

*Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*,
    519 U.S. 1077 (1997) ............................................................................................... 4, 35

## Statutes

28 U.S.C. § 132 .............................................................................................................. 19, 33

28 U.S.C. § 1331 ................................................................................................................... 40

28 U.S.C. § 1332 ................................................................................................................... 40

Judiciary Act of 1789, ch. 20, § 30, 1 Stat. 73, 88 (1789) ............................................. 19

Judiciary Act of 1793, ch. 22, § 6, 1 Stat. 333, 335 (1793) ........................................... 20

Justice Against Sponsors of Terrorism Act (2016) ........................................................ 33

NY Jud. §53(6) ...................................................................................................................... 9

## Other Authorities

James B. Sloan and William T. Gotfryd, "Eliminating the 100 Mile Limit for Civil Trial
    Witnesses:  A Proposal to Modernize Civil Trial Practice," 140 F.R.D. 33, 34 (1992) ............20

Restatement (Second) of Foreign Relations Law § 66(f) (1965) .................................. 42

Restatement (Second) of Judgments § 15 ....................................................................... 29

Restatement (Third) Foreign Relations Law of the United States § 441(1)(a) (1987) ................ 24

Rhonda Wasserman, "The Subpoena Power:  Pennoyer's Last Vestige,"
    74 Minn. L. Rev. 37 (1989) ......................................................................................... 20

Rules Advisory Committee, Explanatory Note to 2013 Amendment to Rule 45 ........................ 20

*Story on Conflict of Laws* § 8 (7th ed. 1872) .............................................................. 33

## Rules

22 NYCRR, 521.1, 521.3 ....................................................................................................... 9

Federal Rule of  Civil Procedure 65 ................................................................................. 23

Federal Rule of Civil Procedure 44.1 .............................................................................. 43

Federal Rule of Civil Procedure 45(c)(1) ..................................................................... 1, 18

Federal Rule of Civil Procedure 65(d) ............................................................................ 22

# GLOSSARY OF TERMS

| Term | Definition |
|------|------------|
| **1995 U.S. Judgment** | The judgment notwithstanding the verdict entered by Judge O'Neill in favor of CIGNA and against AJA on September 25, 1995. *See Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 899 F. Supp. 1385 (E.D. Pa. 1995). |
| **2000 Liberian Judgment** | The judgment entered by the Liberian Civil Law Court in favor of AJA on October 4, 2000 in *Abi Jaoudi & Azar Trading Corp. v. CIGNA Worldwide Ins. Co.* |
| **2001 U.S. Injunction** | The injunction entered by Judge O'Neill on April 3, 2001. *See Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 167 F. Supp. 2d 743, 745 (E.D. Pa. 2001). |
| **2002 Liberian Injunction** | The injunction entered by the Liberian Civil Law Court on April 22, 2002 affirming that the 2000 Liberian Judgment was valid. Ex. B. |
| **ACE** | Ace Limited, previously a Cayman Islands, now a Swiss, insurance company, which acquired all of CIGNA's relevant assets and liabilities. |
| **AJA** | Respondent/nominal plaintiff The Abi Jaoudi and Azar Trading Corp. |
| **Cayman Action** | The civil action brought in the Grand Court of the Cayman Islands by the Receiver against ACE in its capacity as CIGNA's indemnitor on July 9, 2008, *CIGNA Worldwide Ins. Co. (By and through its court appointed receiver, Josie Senesie, and in respect of the assets, under takings and affairs of its licensed Liberian branch and business) v. ACE Limited*, Cause No. FSD 39 of 2008, including the related costs proceedings currently pursued by ACE against the Receiver and others. |
| **CCI** | CC International, Limited, a Nevis company whose shareholders included AJA and the G-22. |
| **CIGNA** | CIGNA Worldwide Ins. Co. |
| **Commissioner** | The Liberian Insurance Commissioner, Josie Senesie, and his successor Foday Sesay. |
| **Echemus** | The four Echemus entities—Echemus Group, L.P., Echemus Investment Management, Ltd., Echemus International, Ltd., and EF (USA) LLC—that were named as non-party respondents in CIGNA's May 10, 2012 motion for contempt. |

| Term | Definition |
| --- | --- |
| **G-22** | A group of 22 Liberian policyholders (not including AJA) who successfully sued CIGNA in 2005 for breach of insurance contracts in Liberian Civil Law Court. |
| **Kelleher** | Non-party respondent Garrett Kelleher. |
| **Kenney** | Non-party respondent Martin S. Kenney. |
| **Liberia Litigation** | The coverage litigation initiated by AJA against CIGNA in the Liberia Civil Law Court in 1998, which resulted in the 2000 Liberian Judgment. |
| **Little** | Former non-party respondent James Little, who was named as a non-party respondent in CIGNA's May 10, 2012 motion for contempt. |
| **Lohman** | Non-party respondent Samuel Lohman. |
| **Senesie** | Former Liberian Insurance Commissioner Josie Senesie. |
| **Sesay** | Senesie's successor as Liberian Insurance Commissioner, Foday Sesay. |

In this case, Defendant is charged with criminal contempt for disobeying the Court's October 14, 2016 Order ("Order") that he appear in person at the December 14, 2016 hearing in the related civil contempt proceedings. The charges should be dismissed, because the Order was invalid for at least four independent reasons, all of which may be raised as defenses to the criminal contempt charge.[2]

*First*, the Order was transparently invalid. *See Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967) (if order is "transparently invalid or has only a frivolous pretense to validity," it may be collaterally attacked in a subsequent criminal contempt proceeding); *In re Providence Journal Co.*, 820 F.2d 1342, 1347 (1st Cir. 1986), *opinion modified on other grounds*, 820 F.2d 1342 (1st Cir. 1986), *writ of certiorari dismissed on other grounds*, 485 U.S. 693 (1988) (if an order is transparently invalid, it "cannot serve as the basis for a contempt citation"). The Order was transparently invalid because District Courts have no Congressionally granted or inherent authority to compel non-party foreign citizens to travel from abroad to appear before them. In civil cases, Federal Rule of Civil Procedure 45(c)(1) controls this issue, and does not grant the authority that the Court claimed it had. Further, the Court did not have inherent authority to issue such an order.

*Second*, the Court lacked personal jurisdiction over Kenney. Like a transparently invalid order, an "order entered by a court clearly without jurisdiction over the contemnors" may be collaterally attacked in a criminal contempt case. *Providence Journal Co.*, 820 F.2d at 1347.

---

[1] Capitalized terms are defined in the Glossary of Terms at the beginning of this brief. Emphasis added throughout unless noted. Citations to "R__" are to the record in the civil case, *The Abi Jaoudi and Azar Trading Corp. v. CIGNA Worldwide Ins. Co.*, No. 91-6785.

[2] The Defendant does not submit or attorn to the jurisdiction of this Court by raising the jurisdictional challenges embodied in this Motion.

Kenney has no relevant contacts with Pennsylvania. Moreover, Kenney acted in good faith, which is a relevant factor in applying the super-contacts theory to a nonparty. If the alleged contemnor knows of the court's order, but has a good-faith belief that his conduct does not violate the court's order, he lacks the requisite culpability for the court to exercise jurisdiction. *Waffenschmidt v. McKay*, 763 F.2d 711, 726 (5th Cir. 1985).

Relatedly, Defendant's decision not to attend the December 14, 2016 hearing was based on a good-faith belief that the Court lacked personal and subject-matter jurisdiction to enter the order. He also relied on the advice of foreign counsel that appearing at the hearing could waive substantive rights under British Virgin Islands law. A conviction for criminal contempt requires a willful violation of a lawful and reasonably specific order of the court. *United States v. KS & W Offshore Eng'g, Inc.*, 932 F.2d 906, 909 (11th Cir. 1991); *In re Eskay*, 122 F.2d 819, 822 n.17 (3d Cir. 1941). Here, Defendant did not and could not have formed the requisite willful intent to violate the Court's orders because he possessed a good-faith belief that as a foreign subject with no minimum contacts with the EDPA, such orders have no application to him, and so the charges against him should be dismissed.

*Third*, the Court's only basis for subject-matter jurisdiction was diversity jurisdiction, but the Court lacked such jurisdiction at all relevant times. Because the Court lacked subject-matter jurisdiction, the Orders are a nullity, and cannot form the basis of a criminal contempt prosecution. *Providence Journal Co.*, 820 F.2d at 1347 (order entered without subject-matter jurisdiction may be challenged in a criminal contempt proceeding); *In re Novak*, 932 F.2d 1397, 1401 (11th Cir. 1991) (same).

*Fourth*, the Court also lacked subject-matter jurisdiction for another reason: derivative sovereign immunity applies. The only conduct that arguably could be construed to violate the

2001 U.S. Injunction took place on behalf of Liberian governmental officials. As the U.S. Department of Justice and Department of State have already opined in this case, those officials are entitled to sovereign immunity to the extent their acts were done in their official capacities pursuant to Liberian law. A Liberian court, the Liberian Embassy, and an expert on Liberian law have all opined that they were. Kenney, as their attorney, was entitled to sovereign immunity as well. As such, sovereign immunity applies and subject-matter jurisdiction is not present.

For all of these reasons, Defendant respectfully requests that the Court dismiss the charges against him.

## STATEMENT OF FACTS

**I.      INSURANCE COVERAGE CASES AND CONFLICTING JUDGMENTS.**

In January 1990, CIGNA Worldwide Insurance Company ("CIGNA") issued a property and casualty insurance policy to The Abi Jaoudi and Azar Trading Company ("AJA"), a major African grocery-store chain, covering damage to AJA's property in Liberia. R1. CIGNA also issued policies to others, including a group of 22 companies known as the "G-22." Civil unrest then swept through Liberia. During this period, the property of AJA and of the G-22 was damaged. AJA and the G-22 submitted claims to CIGNA, which CIGNA rejected. In October 1990, CIGNA abandoned its Liberian operations, *AJA*, 391 F. App'x 173, 174 (3d Cir. 2010), leaving insufficient assets to cover its insurance obligations, in violation of Liberian insurance laws. Ex. A.

In 1991, with the Liberian courts non-functioning, AJA sued CIGNA in the Eastern District of Pennsylvania to recover under its policy. R1. CIGNA asserted that a war-loss exclusion clause in the AJA policy barred coverage. AJA contested application of the exclusion, objected to CIGNA's bad faith in adjusting its claim, and prevailed at a jury trial in 1994. Judge

O'Neill, however, issued a JNOV (referred to in this brief as the "1995 U.S. Judgment") which negated the jury's verdict. *Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 899 F. Supp. 1385 (E.D. Pa. 1995), *aff'd*, 91 F.3d 13 (3d Cir. 1996), *cert. denied*, 519 U.S. 1077 (1997). At that point, all U.S. proceedings on AJA's claims concluded. At no time before the case was closed did the District Court enter any order retaining jurisdiction; nor did it issue injunctive relief.

In 1998, AJA filed the Liberia Litigation. *See* R422-16. CIGNA did not then seek an anti-suit injunction from Judge O'Neill. Instead, CIGNA appeared in the Liberia Litigation and argued the 1995 U.S. Judgment was *res judicata*. Ex. B at 2. The Liberian court refused to recognize the 1995 U.S. Judgment, holding that the JNOV violated the Liberian Constitution, which guarantees an absolute right to trial by jury. *Id*. Even after this ruling, CIGNA continued to defend the Liberia Litigation, participating in the disposition of law issues, which is the first major stage of trial in Liberian courts. *Id*. As the fact-finding stage of the Liberian trial approached, CIGNA requested and received several continuances of the trial date. *Id*. Finally, on the day that a jury was to be empaneled, CIGNA refused to proceed and was held in default. *Id*. Following an evidentiary hearing on damages, on October 4, 2000, the Liberian Court entered judgment against CIGNA for approximately $65 million. R422-16.

The G-22 also brought a claim against CIGNA in Liberia. That claim proceeded to judgment in favor of the G-22 in August 2005 in the amount of approximately $29 million. R422-17.

## II.     1999 SALE OF LIBERIAN LIABILITIES TO ACE.

On January 11, 1999, during the pendency of the Liberia Litigation, the parent of CIGNA sold its property and casualty insurance business to ACE, which was then a Cayman Islands corporation. Ex. C. (It is now a Swiss corporation known as Chubb Ltd.) The transfer included

all "assets, liabilities and obligations pertaining to CIGNA Worldwide Insurance Company's run-off business in Liberia." *Id.* §§ 1.5, 10.1, Disclosure Schedule § 1.5.

ACE agreed to indemnify CIGNA for all of the transferred liabilities, and also acquired the right to control the defense of any claim arising out of CIGNA's Liberian operations. *Id.* §§ 1.5, 9.4(a), 9.7(b)–(c). CIGNA was required to cooperate with ACE's defense of any such claim and "cooperate with [ACE] and its counsel in contesting any Asserted Liability, or, if appropriate and related to the Asserted Liability in question, in making any counterclaim against the Third Party Claimant, or any cross-complaint against any person." *Id.* § 9.7(b). Any such cooperation was to be "at the sole cost and expense of [ACE]." *Id.*

On July 2, 1999, the sale was completed, and all of CIGNA's property and casualty business was transferred to ACE. *Id.* CIGNA, a Delaware corporation, became an empty shell in relation to that business. *See id.*

## III. 2001 U.S. INJUNCTION.

On March 6, 2001, following its loss to AJA in the Liberia Litigation, CIGNA—acting on behalf of ACE—brought a new claim before Judge O'Neill seeking an injunction. *See Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 167 F. Supp. 2d 743, 745 (E.D. Pa. 2001). When it filed its motion for an injunction, CIGNA did not inform the Court of its sale of the Liberian liabilities to ACE, or that ACE was now the real party in interest.

ACE, through CIGNA, characterized the relief it sought as an "anti-suit injunction." *See* Ex. D. A traditional anti-suit injunction is sought when there are two pending claims and the objective is to prevent a race to judgment. In contrast, here, by the time CIGNA filed its motion, both coverage cases were over. *See* SOF, Section I, *supra*. Thus, CIGNA was not asking the Court to enjoin an action that might lead to a conflicting judgment. It was seeking an injunction

prohibiting AJA from *enforcing* the 2000 Liberian Judgment entered months earlier. AJA did

not appear or respond. *Younis Bros.*, 167 F. Supp. 2d at 745.

On April 3, 2001, the Court held that it had personal jurisdiction over AJA because AJA

previously had consented to its jurisdiction and entered the 2001 U.S. Injunction. The 2001 U.S.

Injunction provides that:

> Plaintiffs The Abi Jaoudi and Azar Trading Corp. and Younis
> Brothers & Co., Inc. are prohibited and enjoined from initiating,
> maintaining, continuing or taking any actions that conflict with,
> constitute an attack upon, or seek to nullify this Court's final order
> dated September 15, 1995, and the judgment entered pursuant
> thereto. Additionally, plaintiff The Abi Jaoudi and Azar Trading
> Corp. is prohibited and enjoined from taking any action to enforce
> in any jurisdiction the Liberian judgment against defendant
> CIGNA dated October 4, 2000.

*Id*. at 747.

## IV.    2002 LIBERIAN INJUNCTION.

Following entry of the 2001 U.S. Injunction, AJA sought clarification of its rights from

the Liberian courts. On April 22, 2002, Judge Kaba of the Liberian Civil Law Court ruled that

the 2001 U.S. Injunction is unenforceable and reaffirmed that the 2000 Liberian Judgment is

valid. Judge Kaba found that CIGNA had more than sufficient notice that its obligations would

be determined by a Liberian court. CIGNA, wrote Judge Kaba, "was aware that the insurance

contracts, having been issued in Liberia to insure risks and properties in Liberia, were governed

by Liberian law." Ex. B at 2. CIGNA "was also aware that under Liberian law, [AJA] has an

absolute right to secure enforcement of the obligations of these insurance contracts in a Liberian

court." *Id*. at 3.

Judge Kaba found that, when CIGNA moved for a JNOV in 1995, it did so "knowing

fully well that a judgment n.o.v. is not cognizable under Liberian law," because the Liberian

Constitution guarantees an absolute right to a jury trial. *Id*. Thus, CIGNA "must have known and should have known that the judgment creditor would institute another action in Liberia for purposes of exercising its full rights under Liberian law." *Id*. Judge Kaba went on to highlight CIGNA's conduct in the Liberia Litigation and its failure to seek an anti-suit injunction in the United States long after CIGNA had litigated in Liberia and lost:

> It is clear from what transpired at this Court that the judgment debtor itself did recognize that an anti-suit injunction is not applicable where the first judgment is not cognizable in the jurisdiction in which the second suit has been instituted. That is, when the judgment creditor instituted its action in Liberia and the writ of summons was served; instead of applying for an anti-suit injunction after service of the writ of summons, the judgment debtor appeared, filed an answer, pleading generally to the issues raised in the complaint, and also filed a motion to dismiss on the basis of the doctrine of res judicata. The motion was denied for reason that the judgment n.o.v. could not be given full faith and credit in Liberia on the grounds already stated above. At that time, the judgment debtor never applied for an anti-suit injunction; instead, the judgment debtor applied for other reliefs from this Court and the Supreme Court of Liberia.

*Id*.

Thus, wrote Judge Kaba, "the anti-suit injunction proceeding at the U.S. District Court was not intended to stop the institution of a case or the trial of a pending case; instead, it was intended to stop the enforcement of this Court's judgment. . . . The party who admits jurisdiction by appearing and participating in a court proceeding cannot thereafter deny it . . . particularly after final judgment." Ex. B at 4.

Accordingly, Judge Kaba held:

1. That the "final judgment [entered in Liberia] against the judgment debtor . . . is

   valid and enforceable";

2. "That any person who takes any action or conducts itself in any way to deter or prohibit the enforcement of said final judgment is guilty of contempt of this Court and the appropriate action shall be taken against said persons"; and

3. "That the anti-suit injunction obtained by the judgment debtor from the United States District Court, to deter and prohibit the enforcement of this Court's judgment is a direct affront to this Court; and accordingly, any monetary fines assessed by the United States District Court against the judgment creditor or any person acting for and/or on its behalf for the purpose of enforcing this Court's judgment shall automatically be added to the existing judgment in favor of the judgment creditor[.]"

*Id.*

Therefore, as of April 2002, two conflicting injunctions had been entered: (1) the 2001 U.S. Injunction, which prohibited the litigants from filing an action attacking the 1995 U.S. Judgment or enforcing the 2000 Liberian Judgment, and (2) the 2002 Liberian Injunction, which reaffirmed that the 2000 Liberian Judgment was valid and enforceable, and provided that anyone who interfered with attempts to enforce it would be in contempt of court.

Everything discussed to this point occurred before Kenney had any involvement in the case.

## V. EVENTS PRECEDING CONTEMPT CLAIM.

### A. Kenney has no relevant contacts with Pennsylvania.

Kenney resides in the British Virgin Islands. He is a citizen of Canada and Ireland. He is not and never has been a citizen of the U.S. Kenney is the Managing Partner of Martin Kenney & Co., Solicitors, a specialist, multi-jurisdictional investigative and litigation law firm located in

the British Virgin Islands.  Ex. F ¶ 7.  Kenney has been recognized by publications around the world as "one of the world's leading authorities on the legal aspects of freezing and seizing assets in multiple jurisdictions."  *See* www.martinkenney.com/about.

Kenney is licensed to practice law in England and Wales, the British Virgin Islands, St. Vincent & the Grenadines, and British Columbia (as a non-practicing Barrister & Solicitor).  *Id*. ¶¶ 3, 7.  At the material time, Martin Kenney & Co., Solicitors maintained bank accounts in the British Virgin Islands, Ireland, and New York to facilitate British Virgin Islands domestic and international payments.  *Id*.  Kenney visits the U.S. occasionally for brief client meetings, to speak at conferences, and while in transit on trips abroad.  *Id*. ¶¶ 7, 9.  Kenney is also licensed in New York as a foreign legal consultant, but he has not worked in New York since 1997.[3]  *Id*. ¶¶ 4, 6.  In 1997, Kenney moved to Ireland.  *Id.* ¶ 6.  He remained an inactive 1% member in the New York consultancy until 2004, when he ceased any relationship with the firm.  *Id.*

Kenney visited Pennsylvania twice in 1997 for hockey games.  *Id.* ¶ 8.  He visited Pennsylvania on a few occasions in the early 2000s in connection with an unrelated asset recovery matter.  *Id.* ¶ 8.  Kenney was acting for an Irish company that specialized in fraud investigations, and was performing consulting work for a party domiciled in the British Virgin Islands.  *Id.*  Kenney has not been to Pennsylvania since.  *Id.*; Ex. G.

**B.      Kenney and his law firm represented AJA from December 2003 to March 2006 and CCI from March 2006 to April 2007.**

In December 2003, more than a year after the Liberian Court entered the 2002 Liberian Injunction, AJA retained Kenney and his law firm to advise on collection of the 2000 Liberian Judgment.  Ex. F ¶ 12.  AJA was referred to Kenney by Samuel Lohman, another attorney

---

[3]  A foreign legal consultant in New York is an attorney from a foreign country who can provide legal services in New York subject to numerous restrictions.  NY Jud. §53(6); 22 NYCRR, 521.1, 521.3.

retained by AJA, who was also a respondent in the civil contempt case. *Id.* Kenney and his law firm also later advised the G-22 on their case against CIGNA. *Id.* ¶ 13.

Kenney and his law firm represented AJA from December 2003 until March 2006, providing advice regarding the recovery on the 2000 Liberian Judgment. *Id.* ¶¶ 12–17. Kenney acted as a lawyer who did his best to serve his clients' interest, while also complying with his ethical and legal obligations. *Id.* ¶ 39. Kenney's involvement in this case was public knowledge no later than August 2005. Ex. I.

In 2005, AJA and the G-22 entered into a joint venture to fund legal expenses. Ex. F ¶ 14. After a series of transactions, the right to proceeds of the 2000 Liberian Judgment was acquired by a Nevis company called CCI. *Id.* CCI funded the Commissioner's litigation efforts against ACE in the Cayman Action. Kenney was never an investor, shareholder, or director of CCI. Ex. F ¶ 15. Kenney merely provided legal advice to CCI regarding its collection efforts. *Id.* ¶ 17. CCI and its lawyers investigated their potential remedies against CIGNA and approached the Commissioner about the availability of remedies under Liberian law. *Id.* ¶ 20.

**C.      In April 2007, the Liberian Insurance Commissioner retained Kenney to pursue CIGNA's remaining assets.**

In April 2007, following an investigation by the Liberian government, Liberia's Minister of Justice petitioned the Liberian Civil Law Court for the appointment of the Commissioner as receiver and liquidator of CIGNA's Liberian operations. Ex. K. On April 24, 2007, the Liberian court ordered that appointment, and the Insurance Commissioner, Josie Senesie, became the Receiver. Ex. L. As Receiver, the Commissioner was required by court order to take control of property related to, or deriving from, the Liberian branch and business of CIGNA and prosecute legal or arbitral proceedings to collect and liquidate such property for the benefit of the Liberian creditors of CIGNA. *Id.*

10

On April 25, 2007, Kenney ceased representing CCI and was retained by the Commissioner to provide advice regarding the Commissioner's efforts to obtain value from the sole remaining asset of CIGNA's Liberian branch: a claim against ACE for indemnification against the AJA and G-22 Liberian judgments. Ex. F ¶¶ 21, 23. The Receiver and his attorneys identified the Cayman Islands as the appropriate forum for the litigation against ACE, and Kenney and Lohman's law firms worked with the Receiver to retain Cayman Islands counsel and prosecute the Cayman Action. *Id.* ¶ 23. Cayman counsel consisted of Walkers, one of the two largest law firms in the jurisdiction, as well as the late Lord Patrick Neill QC of London as leading counsel for the Receiver.

As part of his preparation for the litigation, and recognizing the potential problems of international comity presented by the conflicting injunctions, the Receiver obtained an opinion from Columbia University law professor Hans Smit, a leading expert on international law. Ex. M. Smit opined that the 2000 Liberian Judgment is valid, *id.* ¶¶ 30–44, and that the 2001 U.S. Injunction is not enforceable in the Cayman Islands, *id.* ¶¶ 24–29. Smit reached these conclusions under the well-established principles that (a) the second judgment in time controls, particularly where the effect of the earlier judgment was litigated by the party that prevailed in the earlier proceeding, *id.* ¶¶ 30–44, and (b) injunctions do not apply extraterritorially, *id.* ¶¶ 24–29.

**D.      The Cayman Action and initial motion for contempt.**

On July 9, 2008, the Receiver filed the Cayman Action. R422-23. That suit sought to collect the liabilities of the Liberian branch of CIGNA from ACE. *Id.* CIGNA was not a party to the Cayman Action, and the Cayman Action did not seek to recover anything from any U.S. citizen.

11

In response to the Cayman Action "ACE assembled an international team of lawyers, including Maples, its counsel in the Cayman Islands, Debevoise, which provided both US counsel and UK counsel . . . and Cozen, which had litigated the original case against AJA." R474-16; *see also* R474-12.115–129 (2008 Cozen invoices reflecting numerous communications with ACE and action taken at ACE's direction). In November 2008, ACE's lawyers at Debevoise and Cozen filed, in CIGNA's name, its first motion for contempt, naming the Receiver, Lohman, and others as respondents. R174. ACE was billed for, and allegedly paid, all expenses relating to both cases. Ex. N (Cozen invoices directed to ACE); Ex. O (Debevoise invoices directed to ACE).

The contempt motion, which was assigned to Judge Fullam, sought sanctions to compel the Receiver and Lohman to end the Cayman Action. *Id.* The Receiver and Lohman asserted sovereign immunity and contested jurisdiction. R189; R190. On January 12, 2009, the District Court rejected both arguments. R200. Lohman and the Receiver appealed to the Third Circuit. *See* SOF, Section VI.A, *infra*. During the appeal, the parties agreed to stay the Cayman Action effective February 6, 2009. R212. No action has been pursued on the 2000 Liberian Judgment since. Ex. F.

In May 2011, Sesay, the successor Commissioner/Receiver, formally withdrew the AJA claim from the Cayman Action. *Id.* On January 27, 2012, the Cayman judge ordered the Receiver to post $850,000 in security for a portion of ACE's legal costs in that action. Ex. P. On February 24, 2012, the Grand Court of the Cayman Islands ordered the dismissal of the Cayman proceedings due to the Receiver's inability to post security. R422–34.

## VI. CIVIL CONTEMPT PROCEEDINGS.

### A. Third Circuit ruling and State Department opinion.

On appeal, the Third Circuit vacated Judge Fullam's ruling and ordered the District Court to consider Senesie's and Lohman's right to common-law sovereign immunity. *AJA*, 391 F. App'x at 179. The Court of Appeals instructed the District Court to permit the State Department to provide an opinion on the applicability of the doctrine of common-law sovereign immunity. *Id.* at 179–80. On remand, the case was reassigned to this Court (Diamond, J.).

On December 5, 2011, upon the State Department's request, the U.S. Department of Justice, Civil Division, issued a Statement of Interest to this Court. Ex. Q. Notably, the Department of Justice did not call into question the legitimacy of the 2000 Liberian Judgment, the legitimacy of the 2002 Liberian Injunction or the adequacy of the Liberian judicial system. *See id.* The Department of Justice opined that Commissioner Senesie, his replacement Sesay, and their attorney Lohman (to the extent he was acting for Senesie or Sesay) were entitled to sovereign immunity if Senesie or Sesay were, under Liberian law, acting in whole or in part in their official capacities as Insurance Commissioners when taking the acts that formed the basis for CIGNA's contempt motion. *Id.* at 15.

Thereafter, the Liberian Civil Law Court issued an order declaring that Commissioners Senesie and Sesay were acting in their official capacities as Insurance Commissioners when taking the actions at issue here. Ex. R. In doing so, the court took into account numerous factors, concluding that the roles of Commissioner and Receiver were inextricably interrelated and that the Commissioner/Receiver acts as a public or state official when carrying out his duties as receiver of a delinquent alien insurer. *Id.* ¶¶ gg-jj.

**B.     CIGNA's May 2012 contempt motion and jurisdictional discovery.**

In May 2012, CIGNA renewed the contempt proceedings through a new contempt

motion naming, among others, Kenney, Lohman, Senesie, James Little, and Echemus.  R307.

ACE directed the filing of this motion and was billed for, and presumably paid, all expenses

relating to it.  *See*, *e.g.*, Ex. S (lead counsel's invoices, directed to ACE and reflecting numerous

communications with ACE's inside counsel regarding the contempt proceedings).  CIGNA's

May 2012 contempt motion sought to require Kenney, Little, and Echemus to file affidavits

stating that they "disavow[ ] any right, and shall not, seek to enforce, or assist or counsel in the

enforcement of, the Liberian Judgment in any jurisdiction, or assist in or fund efforts to do so, or

otherwise initiate, maintain, continue or take any action that conflicts with, constitutes an attack

upon, or seeks to nullify this Court's Order of April 3, 2001 in the present matter," and to pay

damages.  In a declaration filed in response to the motion, Kenney provided the affirmation

CIGNA requested:  he would do nothing more to pursue the 2000 Liberian Judgment.  Ex. F

¶ 34.

Kenney, Little, and Echemus asked the Court to dismiss the proceedings for lack of

personal and subject-matter jurisdiction, sovereign immunity, and comity.  R350 & R351.

CIGNA, claiming it needed "jurisdictional discovery," served broad discovery requests on all of

the new nonparty respondents.  The Court allowed CIGNA to take discovery only from Little,

who resides in Maryland.  R334.  Kenney provided to Little, and Little produced, thousands of

documents that CIGNA had requested.

In the midst of jurisdictional discovery, on December 7, 2012, the Court denied CIGNA's

motion for contempt without prejudice, ruling that CIGNA could renew its motion after

discovery.  R360.  CIGNA continued to pursue discovery that went far beyond what was needed

to respond to the Respondents' jurisdictional defenses, leading to numerous disputes. Among

other disputes, CIGNA challenged privilege designations made by Kenney (who had provided

documents to Little) and Joseph Lilly, a New York attorney who had once represented CCI and

was served with a third-party subpoena by CIGNA. Following several discovery motions and

extensive briefing, the Court ordered Little and Lilly to provide 108 documents for *in camera*

review. July 15, 2013 Order (filed under seal). After its review, the Court agreed with Little,

Kenney, and Lilly that most of those documents were privileged. *See* R417.

### C. CIGNA's February 2015 contempt motion.

In February 2015, CIGNA filed a renewed contempt motion. R422. This motion

dropped numerous respondents who had previously been named, including Senesie, the Liberian

Commissioner/Receiver who filed the Cayman Action, Sesay, his successor, and Echemus. It

named only AJA, Kenney, Lohman, and Garrett Kelleher. As with the previous motions for

contempt, ACE directed and paid for the prosecution of this motion. *E.g.*, R481–3.

CIGNA's February 2015 motion raised no new jurisdictional facts as to Kenney. All of

the relevant jurisdictional facts—indeed, all of the material facts needed to decide this case as to

Kenney—were contained in Kenney's declaration filed in June 2012. *See* Ex. F. Instead,

CIGNA proceeded solely under the super-contacts theory of personal jurisdiction. *See* R422.

### D. The ruling on the contempt motion and order to appear.

On July 22, 2016, the Court entered a Memorandum Opinion and Order holding Kenney,

Kelleher, and Lohman liable for aiding and abetting AJA's violation of the 2001 U.S. injunction.

Ex. T. The Court ordered "supplemental briefing as to the appropriate remedy." Ex. T at 44.

On August 5, 2016, CIGNA filed a memorandum requesting approximately $14.6 million in

compensatory sanctions against Kelleher and Lohman, which it claimed was the amount of

ACE's attorneys' fees, and about $10.4 million as to Kenney.  *See* Ex. U at 15.  CIGNA also requested that, if Petitioners were unable to pay this large sum, they be imprisoned.  *Id*. at 34.

Lohman responded by objecting to the reasonableness of CIGNA's request; stating that discovery would be needed to determine reasonableness, but impracticable in this situation; and asking that the Court certify this matter for an interlocutory appeal.  R479.  Two business days later, the Court summarily denied Lohman's request to certify an interlocutory appeal.  R480.  Kenney responded to CIGNA's brief on remedies by filing a Notice informing the Court that he would not respond on the merits to CIGNA's damages claims because doing so could arguably be considered voluntary submission, or attornment, to the jurisdiction of the Court under the common law of the British Virgin Islands with regard to the enforcement of a foreign judgment.  R476.  Kelleher did not respond.  None of the Petitioners indicated that they had or wished to present any evidence regarding the damages sought by CIGNA.

On October 14, 2016, the Court issued an order setting an evidentiary hearing "to determine the amount of damages suffered by [CIGNA]"for December 14, 2016 and commanding Petitioners to "**APPEAR IN PERSON**" (emphasis in original) at the hearing.  Ex. V.  The October 14 order further stated:  **FAILURE TO COMPLY WITH THIS ORDER WILL RESULT IN THE IMPOSITION OF SANCTIONS UPON THE INDIVIDUAL(S) RESPONSIBLE.  FAILURE TO APPEAR WILL RESULT IN PROSECUTION FOR CRIMINAL CONTEMPT.**  Ex. V.  The October 14, 2016 order did not explain *why* the Court felt Petitioners' personal appearance at the evidentiary hearing was needed.

On October 28, 2016, Kenney and Lohman moved the Court to vacate or reconsider its order.  Ex. W; Ex. X.  On October 31, 2016, Kelleher, acting *pro se*, did the same.  Ex. Y.  On

November 22, 2016, the Court summarily denied all three motions.  Ex. Z.  All three respondents

then appealed, and their appeals were dismissed for want of appellate jurisdiction.

### E.        The December 14, 2016 hearing and Criminal Contempt Notice.

On December 14, 2016, the Court held the evidentiary hearing on CIGNA's damages.  A

transcript is attached as Exhibit AA.  Lohman appeared in person; Kenney and Kelleher did not.

Upon learning Lohman had personally appeared, the Court refused Lohman's offer to testify and

instead summoned three United States Marshals to the courtroom and ordered them to seize

Lohman's passport.  Ex. AA at 19–20.  Over Lohman's counsel's objections and despite his

offers to substantiate the hardship that seizing Lohman's passport would cause Lohman, the

Court then ordered Lohman to remain in the jurisdiction indefinitely, to comply with asset

discovery requested by CIGNA, and to engage in settlement discussions with CIGNA.  Ex. AA

at 20–26.

On December 16, 2016, CIGNA deposed Lohman in Philadelphia regarding his assets.

*See* R505, R506.  On December 19, 2016, Lohman's counsel sent a letter to the Court reporting

that Lohman had fully complied with its order that he participate in asset discovery, and

requesting that the Court return his passport.  R506.

On December 21, 2016, CIGNA and Lohman executed a written settlement agreement

and release, which they submitted to the Court that day.  Ex. BB.  Under the settlement

agreement, Lohman is to pay CIGNA $225,000.  *Id*.  Finally, on December 22, 2016, after

learning Lohman and CIGNA had settled, the Court ordered that Lohman's passport be returned

to him.  Ex. CC.

On February 8, 2017, the Court issued an Order to Show Cause and Notice Charging Criminal Contempt ("Criminal Contempt Notice"). On March 17, 2017, the Court issued an arrest warrant against the Defendant. Dkt. No. 5.

## ARGUMENT

## I. THE UNDERLYING ORDERS WERE TRANSPARENTLY INVALID, BECAUSE THE DISTRICT COURT DID NOT HAVE AUTHORITY TO COMPEL DEFENDANTS TO PERSONALLY APPEAR.

The Court had no authority to order Petitioners to appear for the December 14, 2016 hearing. Doing so exceeded its lawful power, rendering its Order transparently invalid.[4] *See Walker*, 388 U.S. at 315; *Providence Journal Co.*, 820 F.2d at 1347.

### A. The Court did not have authority to compel Defendants to appear under Rule 45.

Orders to appear at a trial or hearing are governed by Federal Rule of Civil Procedure 45(c)(1), which states:

> A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
>
> > (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
> >
> > (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
> >
> > > (i) is a party or a party's officer; or
> > >
> > > (ii) is commanded to attend a trial and would not incur substantial expense.

---

[4] The Order also required Kenney to waive substantive rights with no effective mode of review – which, like the transparently invalid doctrine, also are recognized grounds to collaterally attack an underlying order in a criminal contempt case. *Providence Journal Co.*, 820 F.2d at 1347; *In re Novak*, 932 F.2d at 1401 (collecting cases). Regarding the substantive rights Kenney was forced to waive, see his Motions to Vacate filed in the civil contempt proceeding, which are attached and incorporated by reference herein.

None of those situations exists here.  Petitioners do not live in, work, or regularly transact business in person in Pennsylvania, or within 100 miles of Philadelphia.  Thus, the Court lacked authority to order their attendance under Rule 45.

**B.     The Court did not have inherent authority to compel Defendants to appear.**

The Court also did not have inherent authority to compel Petitioners to appear.  District Courts are created by statute, and their power is established by Congress.  28 U.S.C. § 132 (establishing and governing the District Courts); *Sheldon v. Shill*, 49 U.S. 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers."); *Ex parte Robinson*, 86 U.S. 505, 511 (1873) (the "powers and duties" of the District Courts "depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction").  Further, it is well-settled that a presumption against extraterritoriality applies to Acts of Congress.  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013); *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2106 (2016).  Congress has done nothing to indicate that it wants the District Courts' general or inherent authority to extend abroad.

Although District Courts have some limited inherent power to manage proceedings, the "exercise of the inherent power of lower federal courts can be limited by statute or rule, for 'these courts were created by acts of Congress.'"  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) (quoting *Ex parte Robinson*, 86 U.S. at 511)).  Since the day it established the District Courts, Congress has placed strict territorial limits on the authority of the District Courts to compel persons to come before them for a trial or hearing.  In the Judiciary Act of 1789, the First Congress established the District Courts and provided that the courts could not require any person to travel more than 100 miles or into another judicial district to give testimony.  Judiciary Act of 1789, ch. 20, § 30, 1 Stat. 73, 88 (1789).  Four years later, Congress modified the statute

to allow service across districts, but only if "in civil cases, the witnesses living out of the district in which the court is holden, do not live at a greater distance than one hundred miles from the place of holding the same."  Judiciary Act of 1793, ch. 22, § 6, 1 Stat. 333, 335 (1793).

The Supreme Court has cautioned that one should not "lightly assume that Congress has intended to depart from established principles" governing the inherent powers of courts. *Chambers*, 501 U.S. at 47.  Here, however, the 100-mile limit is not a departure from the historical inherent powers of courts.  Rather, from the time of the subpoena's invention in fourteenth-century England, testimonial subpoenas "had geographically limited enforceability which was generally tied to the jurisdiction of the issuing court."  James B. Sloan and William T. Gotfryd, "Eliminating the 100 Mile Limit for Civil Trial Witnesses:  A Proposal to Modernize Civil Trial Practice," 140 F.R.D. 33, 34 (1992).  Courts in colonial America followed the same rule.  Rhonda Wasserman, "The Subpoena Power:  Pennoyer's Last Vestige," 74 Minn. L. Rev. 37, 49 (1989).  Early American courts therefore had no inherent power to compel the attendance of witnesses outside their jurisdiction.  Thus, when the First Congress legislated territorial limits on subpoenas, it was merely codifying a settled rule that had been established over centuries of practice.  In other words, although District Courts have some limited inherent authority as to some issues, when it comes to the power to compel attendance at a trial or hearing, their authority ends at the limits of Rule 45.

In modern times, Rule 45 keeps this ancient rule in place.  *See* Rules Advisory Committee, Explanatory Note to 2013 Amendment to Rule 45 (adopting the reasoning of *Johnson v. Big Lots Stores, Inc.*, 251 F.R.D. 213, 214 (E.D. La. 2008) and explaining that Rule 45 "does not authorize a subpoena for trial" outside the strict territorial limits set out in the rule).

Thus, the District Courts have no power to compel attendance outside of that given Rule 45, and never have.

In sum, Congress has expressly defined the scope of the District Courts' power to compel attendance at hearings by witnesses and parties, and no inherent authority exists broader than the territorial limits Congress has prescribed. The Court therefore did not have any authority to compel Petitioners to travel from abroad appear.

## II.    THE COURT LACKED PERSONAL JURISDICTION OVER KENNEY.

An order entered by a court that clearly lacked personal jurisdiction over the alleged contemnors may be challenged in subsequent criminal contempt proceedings. "Were this not the case, a court could wield power over parties . . . obviously not within its authority – a concept inconsistent with the notion that the judiciary may exercise only those powers entrusted to it by law." *Providence Journal Co.*, 820 F.2d at 1347 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947)). As discussed next, the Court did not have personal jurisdiction over Kenney, and the charges against him should be dismissed on this basis.

### A.    Applying the super-contacts theory to Kenney, a foreign nonparty who acted abroad, violates due process.

The Supreme Court repeatedly has held that the Due Process Clause limits a court's authority to exercise personal jurisdiction to persons that have minimum contacts with the forum state. *E.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Under the super-contacts theory, some courts have held that U.S. citizens who knowingly aid and abet contemptuous acts may be haled into court for contempt, even absent traditional minimum contacts with the forum state. *E.g.*, *Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985).

The super-contacts theory relies on the nationwide effect of injunctions and the duty of U.S. citizens to comply with federal court orders. Neither the Supreme Court nor the Third

Circuit has ever endorsed the theory. But even if the theory is valid, it is inapplicable here, because Kenney was a foreign nonparty, all relevant conduct occurred abroad, and all relevant actors were acting in conformity with Liberian court orders.

> ### 1. The super-contacts theory applies only to U.S. citizens and domestic conduct.

The super-contacts theory was first developed in *Waffenschmidt*. There, out-of-state U.S. citizen nonparties assisted an enjoined defendant in violating a preliminary injunction. 763 F.2d at 714. Despite the nonparties' absence of contacts with the forum, the Fifth Circuit held that the district court could assert jurisdiction over them. *Id.* at 715–16. The court posited that federal judges "possess inherent authority to enforce their own injunctive decrees," a power codified in Fed. R. Civ. P. 65(d), and that, because the U.S. Courts operate in a federal system, this power runs "nationwide." *Id.* at 715–16. From there, the court held that the nonparties' acts of knowingly aiding and abetting violation of an injunction made it foreseeable and reasonable to force the aider or abettor to answer in the forum where the injunction was issued. *Id.* at 721–22.

The Court relied on *Waffenschmidt* and four other cases that it considered super-contacts cases. *See* Opinion at 14-15. All but one of those four involved nonparty U.S. citizens acting on American soil. *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 972 (11th Cir. 2012), held that a bankruptcy discharge injunction should be given nationwide effect. In so holding, the court relied on the exclusive jurisdiction in the bankruptcy court and the *in rem* nature of the bankruptcy estate. *ClearOne Commc'ns v. Bowers*, 651 F.3d 1200, 1215 (10th Cir. 2011), held merely that an out-of-state U.S. citizen was subject to personal jurisdiction for knowingly aiding and abetting violation of injunction through acts in the U.S. And *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195–96 (2d Cir. 2010) similarly held that a nonparty U.S. citizen is subject to personal jurisdiction for aiding and abetting violation of protective order in the United States.

None of these cases involve extraterritorial conduct or the extraterritorial application of an injunction.

The single outlier, *SEC v. Homa*, 514 F.3d 661 (7th Cir. 2008), held that U.S. citizens who maintained ties to the U.S. could be held in contempt for acts that took place abroad. In affirming the district court's jurisdiction, the Seventh Circuit emphasized the obligation of *U.S. citizens* to follow federal court orders. *Id.* at 674–75. Specifically, the court held that, "as *citizens of the United States*, [the citizen/contemnors] were required, once they had adequate notice, to obey the order of a United States court directed at them and their activities." *Id.* Citizenship was the "more important" part of this analysis, but further supporting it, the alleged contemnors maintained Florida driver's licenses; one of them maintained a post-office box in Florida; and one had case-specific contacts in Florida. *Id.* at 665–67.

The above authority shows that the super-contacts theory is based on three basic principles: First, injunctions issued by federal courts are nationwide in scope. *Waffenschmidt*, 763 F.2d at 716 (citing Fed. R. Civ. P. 65). Second, Rule 65 extends the injunction to persons other than the parties in the case, and U.S. citizens are required, once they have adequate notice, to obey the order of a U.S. court directed at them and their activities. *See Homa*, 514 F.3d at 674–75. Third, because of the previous two rules, a U.S. citizen who knows he is violating a federal court order has "purposefully availed" himself of the forum state. *Waffenschmidt*, 763 F.2d at 723. Following this reasoning, courts have held that, on the right facts, super-contacts can substitute for "minimum contacts" for U.S. citizens without violating the citizens' rights to due process. *See id.*

### 2. Extending the super-contacts theory to foreign nonparties acting abroad violates due process.

In the civil case, the Court violated the above principles and extended the super-contacts theory well beyond the rulings of any other court. The Court held that, under the *Waffenschmidt* super-contacts theory, Kenney, a foreign nonparty with no case-related contacts to the U.S., could be haled into court for acts committed entirely abroad.

*Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995) is the only reported case dealing with similar issues. *Reebok* shows why the Court's analysis is insupportable. In *Reebok*, a Luxembourg bank allegedly violated a district court's asset freeze order. 49 F.3d at 1389. Despite the bank's compliance with Luxembourg law in releasing the frozen funds, the district court held it in contempt. *Id*. at 1391-92.

Reversing, the Ninth Circuit pointed out that "[a]lthough *Waffenschmidt* speaks in expansive terms, it was speaking about the authority of district courts within the United States." *Id.* at 1391. Though the Luxembourg bank knew of the U.S. order, the Ninth Circuit held that there was no super-contacts jurisdiction over the bank, which had no U.S. presence and whose conduct occurred in Luxembourg. *Id.* at 1394. It reasoned that *Waffenschmidt* does not apply when a case concerns foreign nationals and foreign conduct because "one state cannot require a person 'to do an act in another state that is prohibited by the law of that state' … nor can that person be required to refrain from an act that is required." *Id.* at 1392 (quoting Restatement (Third) Foreign Relations Law of the United States § 441(1)(a) (1987)).

The bank's actions were lawful under Luxembourg law, which required the bank to release the funds. The U.S. TRO therefore subjected the bank to conflicting legal demands. *Id.* The court held that Reebok was not permitted to "turn to the United States district court to punish [the bank] for complying with its own country's statutory and judicial law within that

country," because such action was not "purposefully directed towards the United States." *Reebok*, 49 F.3d at 1393–94.

The Ninth Circuit further found that the exercise of jurisdiction over the bank would not "comport with fair play and substantial justice," despite the district court's interest in adjudicating the dispute. *Id.* at 1394. In sum, the court explained, "there *are* limits to the district court's reach." *Id.*

In 2014, the Second Circuit construed *Reebok* exactly as described above, emphasizing that the exercise of jurisdiction over foreign nationals and foreign conduct must be approached with great caution. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 126 (2d Cir. 2014). In its discussion of specific personal jurisdiction, the court emphasized that no case has applied the super-contacts theory to find personal jurisdiction over "a *foreign* nonparty with only limited contacts with the forum." *Id.* at 137 (emphasis in original). The court distinguished *Waffenschmidt* on the grounds that it applied only to "*domestic* nonparties." *Id.* (emphasis in original).[5]

The Supreme Court's recent decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), reinforces the correctness of *Reebok* and *Gucci*. There, the Supreme Court refused to permit the exercise of general jurisdiction in California over a German parent company despite the extensive California contacts of the parent's U.S. subsidiary. *Id.* at 762. The Court explained that an expansive approach to personal jurisdiction over aliens posed threats to international relations because of the chance that other nations, may take offense at having their citizens answerable in U.S. court for transactions unrelated to any U.S. contacts. *Id.* at 763. Given this

---

[5] On remand, the district court found that specific personal jurisdiction existed, but based on the bank's New York contacts under a typical minimum-contacts analysis, not the super-contacts theory. 135 F. Supp. 3d 87, 97–101 (S.D.N.Y. 2015).

threat to "international rapport," the Court held that subjecting the foreign parent to general jurisdiction in California did not "accord with the 'fair play and substantial justice' due process demands." *Id.* (quoting *Int'l Shoe Co..*, 326 U.S. at 316).

Kenney is situated similarly to the Luxembourg bank in *Reebok*, because he and his law firm acted on behalf of Liberians in conformity with valid Liberian rulings. These included the 2002 Liberian Injunction, which stated that the 2001 U.S. Injunction was an affront to Liberia. Moreover, as a foreign lawyer governed by local rules of professional conduct, Kenney had an affirmative duty to represent his clients to the best of his abilities. This consisted of his acting for a foreign State official and Receiver in mounting an action against a foreign company (ACE) in a foreign jurisdiction (the Cayman Islands), at a time when no U.S. company or person's assets were at risk of loss in the case. Instead of focusing on these facts, the Court focused on AJA's actions—namely, that AJA invoked the jurisdiction of the District Court in 1991 and obtained the 2002 Liberian Injunction only in response to the 2001 U.S. Injunction. Ex. T. Neither of these facts blunts *Reebok*'s effect, because neither changes the most salient fact: a Liberian court held that the 2000 Liberian Judgment was valid and the 2001 U.S. Injunction invalid. Kenney therefore acted in conformity with foreign law. *Reebok*, 49 F.3d at 1394. As such, the super-contacts theory does not provide a basis for personal jurisdiction over Kenney.

### 3. To find personal jurisdiction over Kenney, the Court used an unprecedented hodgepodge of jurisdictional tests.

In its July 22, 2016 opinion, the Court found that Kenney and the other respondents had "undertake[n] activity designed to have a purpose and effect in the forum," and heavily relied on this finding in determining that the court had personal jurisdiction. Ex. T at 15–18. In doing so, the Court referred to the effects test as the "touchstone of the personal jurisdiction inquiry." *Id*. 18. Even assuming the effects test (which is usually applied to defendants in tort cases) is

relevant here, any effect caused by Kenney's behavior is "jurisdictionally relevant only insofar as it shows that the *defendant* has formed a contact with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014) (no jurisdiction in Nevada over Georgia officer whose only tie to Nevada was the effects of his Georgia conduct on to the Nevada plaintiffs).

Here, all of Kenney's conduct occurred abroad. He took no action in Pennsylvania, placed nothing in the stream of commerce to Pennsylvania, did not cause any party any injury within Pennsylvania, and did not do anything to violate the 2001 U.S. Injunction within the United States. Thus, because his "challenged conduct had [nothing] to do with [Pennsylvania] itself," it created no "effect" in the forum sufficient to create personal jurisdiction. *Walden*, 134 S. Ct. at 1125. The Court erred when it held the opposite.

The Court also stated it was using the super-contacts test, but misstated the test. The District Court held that "foreign non-parties [can be held] in contempt when they knowingly conspire with bound parties to violate an injunction." Ex. T at 19. The District Court cited no authority supporting this proposition, because there is none. *See* Argument Section II.A.2 *supra* (discussing *Reebok*). Instead, the court cited two cases in which a foreign plaintiff submitted to jurisdiction[6] and two in which personal jurisdiction was not even mentioned.[7]

The Court also claimed that "numerous courts," including this one, "have rejected the suggestion that individuals (foreign or domestic) may violate American law with impunity

---

[6] These cases are *Paramedics Electromedicina Comercial, Ltda. v. GE Medical Systems Information Technologies, Inc.*, 369 F.3d 645 (2d Cir. 2004) (plaintiff submitted to jurisdiction by filing suit) and *M&C Corp. v. Erwin Behr GmbH & Co., KG*, 508 Fed. App'x 498, 501 (6th Cir. 2012) (defendant waived jurisdictional defense).

[7] These are *Liquid Glass Enters., Inc. v. Liquid Glass Prods. Int'l, Inc.*, 1991 WL 286953, at *6 (E.D. Pa. Oct. 8, 1991) (successor to enjoined party found to have minimum contacts through case-related conduct of its CEO) and *Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935 (9th Cir. 2014) (parties to case held in contempt for assisting nonparties in violating injunction; the nonparties were not held in contempt).

simply because their acts occurred outside the United States." Ex. T at 21. But again, the Court cited no relevant authority. In all of the cases the Court relied upon, jurisdiction was established independent of determining that a party had acted in contempt. *Id*. T. Most notably, in *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 81 (3d Cir. 1994), although the Third Circuit suggested that sanctions could be imposed on the Philippines for its litigation misconduct, the Philippines had submitted to jurisdiction *by filing suit in the United States*, and the sanctions at issue arose directly out of that suit: specifically, the Philippines' intimidation of witnesses. No party in the civil case ever cited, and Defendant does not know of, *any case* holding that foreign acts by foreign nonparties can create personal jurisdiction when there are no contacts with the forum state.

In sum, the Court's analysis of personal jurisdiction was erroneous and not tethered to any apposite authority, and should be revisited in these proceedings, as its lack of personal jurisdiction undermines the validity of the Order.

### B. Kenney, a nonparty, acted in good faith and therefore cannot be held in contempt.

Even assuming the super-contacts theory applied, the Court also erred in its application of the theory. It ignored facts showing that Kenney, a nonparty, acted in good faith. While good faith may not be relevant if an enjoined party violates an injunction, it *is* relevant when a nonparty allegedly does so. *Waffenschmidt,* 763 F.2d at 726 ("good faith is relevant to whether [a nonparty contemnor] aided or abetted . . . *with knowledge* that it was violating the court's orders"). If the alleged contemnor knows of the court's order, but has a good-faith belief that his conduct does not violate the court's order, he lacks the requisite culpability for the court to exercise jurisdiction. *Id.*; *see also M&C Corp. v. Erwin Behr GmbH & Co.*, 508 Fed. App'x 498, 503 (6th Cir. 2012) ("where a party seeks to hold nonparties in civil contempt, it must show that

the nonparties are aware of the injunction and know their acts violate the injunction … by clear and convincing evidence") (quotation marks and citations omitted).

Kenney, a nonparty, had a good-faith belief that his conduct did not violate the 2001 U.S. Injunction for two reasons.

*First*, under well-established principles of judgments, the second judgment in time controls. *See* Restatement (Second) of Judgments § 15. It was, therefore, reasonable for Kenney to conclude that the 2000 Liberian Judgment and 2002 Liberian Injunction controlled over the 1995 U.S. Judgment and 2001 U.S. Injunction. He did not think he was violating any order.

*Second*, Kenney also had a justifiable, good-faith belief that the 2001 U.S. Injunction did not apply abroad. Ex. F ¶¶ 34–39. This belief was supported by the 2002 Liberian Injunction and by the opinion of international law expert and Columbia University law professor Hans Smit that the 2001 U.S. Injunction should not be read to have extraterritorial effect and that the 2000 Liberian Judgment was valid. Ex. M ¶¶ 24–28, 32–52. Moreover, at the time Kenney was committing acts that allegedly violated the injunction, *Reebok* was (and still is) the only case that had decided the relevant issue, and under *Reebok* the 2001 U.S. Injunction does not apply to foreign nationals acting abroad.

The above facts are undisputed. But the Court did not acknowledge the relevance of Kenney's good faith to its super-contacts analysis. As *Waffenschmidt* makes clear, good faith is relevant. By ignoring Kenney's well-founded, good-faith belief, the Court erred. It should revisit that erroneous decision in this case.

The good-faith analysis also is relevant to this criminal proceeding because it shows that Kenney could not have formed the requisite willful intent to violate the Order. There are two types of contempt under federal law: (i) civil and (ii) criminal. Civil contempt is "coercive and

looks to the future"; its goal is to secure compliance with a court order.  *See In re Vaso Active Pharm., Inc.*, 514 B.R. 416, 422-23 (Bankr. D. Del. 2014).  Criminal contempt, on the other hand, is penal in nature and is intended to punish past behavior.  *Id.* at 423.  The essential elements of criminal contempt are a lawful and reasonably specific order of the court and the willful violation of that order.  *See United States v. KS & W Offshore Eng'g, Inc.*, 932 F.2d 906, 909 (11th Cir. 1991).

The Third Circuit has long held that "[i]t is a good defense to an attachment for criminal, but not civil contempt that the contemnor acted in good faith upon advice of counsel."  *In re Eskay*, 122 F.2d 819, 822 n.17 (3d Cir. 1941).  The reason that advice of counsel is a defense to criminal, but not civil, contempt is because that criminal contempt requires proof of willfulness.  *See In re Vaso Active Pharm., Inc.*, 514 B.R. at 423 ("Willfulness or contumacy, however, is a required element only for criminal contempt.").  As such, evidence that the defendant was acting upon the advice of counsel prevents the government from establishing that the defendant acted willfully.  *See In re Walters*, 868 F.2d 665, 668 (4th Cir. 1989) ("Advice of counsel may be a defense in a criminal contempt proceeding because it negates the element of willfulness."); *see also Matthews v. Spangenberg*, 15 F. 813, 814 (S.D.N.Y. 1883) (finding that the defendant's actions did "not appear to have been at all willful or defiant, but merely the exercise of a supposed right under advice, taken and given in good faith, and is not considered to deserve punishment as such").

In the present case, Defendant advanced numerous good-faith jurisdictional defenses in the civil contempt proceeding, including lack of personal jurisdiction, lack of subject-matter jurisdiction, and sovereign immunity (which is equivalent to lack of subject-matter jurisdiction).  For all the reasons set forth in the extensive briefing on these issues in the civil contempt,

Defendant believes that the Court lacked jurisdiction to enter the Order, and he relied on that understanding when he declined to appear at the December 14, 2016 hearing. *See* Ex. AA at 23.

Further, Defendant also acted upon the advice of foreign counsel when he did not appear in person at the December 14, 2016 hearing. Specifically, as set out in the declaration of leading English counsel, Stephen Nicholas Atherton Q.C. (London), Kenney's England-based counsel explained that under the law of the British Virgin Islands, a foreign judgment may be domiciled and enforced only if the British Virgin Islands court decides that the foreign court rendering the judgment validly established jurisdiction over the defendant under British Virgin Islands law. Ex. DD ¶ 19. In making that determination, the British Virgin Islands court will look to many factors, including whether the defendant voluntarily "attorned," or submitted, to the jurisdiction of the court issuing the judgment. *Id*. Atherton explained to Kenney that by appearing, Kenney ran the risk of being subject to personal jurisdiction found through tag jurisdiction, which would likely be recognized as valid by a British Virgin Islands court. *Id*. ¶¶ 19(v), 44–45.

Moreover, as his counsel Atherton further explained, even if Kenney were not served while in Pennsylvania, *any* appearance in person by Kenney before the District Court would be another factor considered by a British Virgin Islands court in weighing whether Kenney attorned once Kenney's personal jurisdiction objections had been overruled by the trial court. *Id*. ¶¶ 41–43. Specifically, if Kenney had followed this Court's order that he personally appear on December 14, he could be construed by a British Virgin Islands court to have waived his right to contest the judgment there. *Id*. As Atherton attested, there was a "clear and serious danger that the BVI Court would conclude that, in the circumstances, Mr. Kenney ought to be taken to have

submitted to the jurisdiction of this Court and that it would therefore be free to recognize and enforce any monetary award made by this Court in favor of CIGNA." *Id.* ¶ 46.[8]

Based on the above, Defendant could not have formed the requisite willfulness to be found guilty of criminal contempt. *In re Eskay*, 122 F.2d at 822 n.17.

### C.    The Court exceeded its power when it expanded the super-contacts theory to cover foreign nonparties acting abroad.

The District Court also erred for a third independent reason:  by expanding the super-contacts theory beyond the national bounds set by *Waffenschmidt* and *Homa*, the District Court did not just offend constitutional due process, it exceeded its statutory power.  District Courts have no inherent authority to exert their power extraterritorially over foreign nonparties. Congressional authority is required.

Recent Supreme Court decisions underscore this fundamental principle.  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), is particularly on point.  In *Kiobel*, the Supreme Court refused to read the Alien Tort Statute ("ATS") to reach foreign conduct.  Despite the international bent of the ATS, the Court found that the statute did not apply to claims arising from conduct abroad.  The Court held that when "a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel*, 133 S. Ct. at 1664.  Accordingly, the Court held that U.S. courts lacked jurisdiction over actions by Nigerian nationals alleged to have aided the Nigerian government in carrying out crimes against humanity.  *Id.* at 1669; *see also RJR Nabisco, Inc. v. European Cmmty.*, 136 S. Ct. 2090, 2106 (2016) (analyzing RICO statute to conclude that while parts of the statute explicitly reach extraterritorial conduct, its private right

---

[8] Mr. Atherton did qualify this opinion by pointing out that a BVI court reasonably could reach the opposite result.  *Id.* ¶ 46.

of action does not); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (absent a clear statement to the contrary, U.S. statutes are presumed to have no extraterritorial effect).

The District Court brushed aside *Kiobel* on the grounds that the presumption against extraterritoriality is a rule of statutory construction. Instead, it ruled, its "jurisdiction over Respondents is inherent." Ex. T at 21. But district courts are themselves created by statute and their jurisdiction is established by Congress. 28 U.S.C. § 132 (establishing and governing the district courts); *Sheldon v. Shill*, 49 U.S. 441, 449 (1850) ("Congress may withhold from any court of its creation jurisdiction"). Congress frequently narrows and expands the scope of that jurisdiction, including as to foreigners. *E.g.*, Justice Against Sponsors of Terrorism Act (2016) (creating jurisdiction in the district courts for certain claims against foreign sovereigns). But Congress has not extended the civil contempt power to reach foreign nonparties acting abroad, and the federal courts have no power to do so on their own.

The "basic premise of our legal system that, in general, United States law governs domestically but does not rule the world." *RJR Nabisco*, 136 S. Ct. at 2100; *Philippines*, 43 F.3d at 79. "[E]ach sovereign nation has the sole jurisdiction to prescribe and administer its own laws, in its own country, pertaining to its own citizens, in its *own* discretion.") *Id.* (emphasis in original) (citing *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116 (1812) (Marshall, C.J.) and *Story on Conflict of Laws* § 8 (7th ed. 1872)). When the District Court extended the super-contacts theory to foreign citizens acting abroad, it exceeded its authority.

## III. THE COURT LACKED DIVERSITY JURISDICTION.

As with personal jurisdiction, if a court is "clearly without jurisdiction over . . . the subject matter," its orders are invalid and therefore may be collaterally attacked in a criminal contempt proceeding. *Providence Journal Co.*, 820 F.2d at 1347; *In re Novak*, 932 F.2d at 1401.

33

The Court lacked subject-matter jurisdiction over the civil contempt proceedings for two reasons: diversity jurisdiction was not present in 2001, and sovereign immunity applies in this case. These two reasons are discussed in this section and the next one.

Judge O'Neill did not have diversity jurisdiction when he issued the 2001 injunction, because in 2001, CIGNA was nothing but an empty shell as to its Liberian business – everything had been transferred to ACE. Thus, when CIGNA filed its 2001 motion asking the District Court to enjoin enforcement of the 2000 Liberia Judgment, CIGNA was merely acting as a conduit for ACE to protect ACE's interests. CIGNA admitted as much in the proceedings below, submitting evidence that demonstrated ACE paid all expenses relating to these proceedings and controlled their litigation. SOF § VI.D *supra*.

As such, ACE was the real party to the controversy that CIGNA initiated in 2001. The District Court therefore lacked diversity jurisdiction when it entered the 2001 U.S. Injunction against AJA – which like ACE, was a foreign party. The "presence of aliens on both sides of the controversy defeats jurisdiction . . . under section 1332(a)(2)." *Dresser Indus., Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 499 (3d Cir. 1997). The District Court therefore also lacked subject-matter jurisdiction over the contempt proceedings.

**A.      The Court did not retain ancillary jurisdiction to rule on CIGNA's 2001 injunction motion, so an independent basis of subject-matter jurisdiction was required.**

The Court held that it retained ancillary subject-matter jurisdiction to decide its 2001 injunction motion because it had diversity jurisdiction over AJA's 1991 complaint against CIGNA insurance coverage. Ex. T at 29. When it did so, it erred, because AJA's original lawsuit was fully resolved, with all appeals exhausted, in 1997. *Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 519 U.S. 1077 (1997) (denying *certiorari*). CIGNA's 2001 motion for an

injunction therefore was a new proceeding requiring an independent jurisdictional basis. *Peacock v. Thomas*, 516 U.S. 349 (1996); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).

The Supreme Court addressed situations similar to this one in *Peacock* and *Kokkonen*. *Peacock* involved a plaintiff's attempt to claim post-judgment relief from a new party pursuant to a veil-piercing theory. 516 U.S. at 352. The plaintiff claimed jurisdiction was present under a theory of ancillary jurisdiction. *Id.* The Supreme Court noted that "[t]he basis of the doctrine of ancillary jurisdiction is the practical need 'to protect legal rights or effectively to resolve an entire, logically entwined lawsuit.'" *Id.* at 355 (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 377 (1978)). But, the Court ruled, that reasoning does not apply when the original case has ended. The Court held that "where the relief sought is of a different kind or on a different principle" than that previously obtained, subject-matter jurisdiction must be re-established. *Id.* at 358 (alterations, quotation marks, and citation omitted).

Similarly, in *Kokkonen*, the Supreme Court held that once a case is dismissed, ancillary jurisdiction does not extend to a motion to enforce a settlement agreement without a new basis for subject-matter jurisdiction. 511 U.S. at 380-81. In other words, unless the court expressly retains jurisdiction, any further proceedings regarding that order or the settlement must have a new, independent basis for subject-matter jurisdiction. *Id.*

Numerous courts have applied *Peacock and Kokkonen* to rule that where a federal court does not expressly retain jurisdiction, a party later seeking new injunctive relief must re-establish subject-matter jurisdiction before it can obtain the new injunction.

A recent decision from the Third Circuit, *Guiuan v. Villaflor*, 544 F. App'x 64 (3d Cir. 2013), aptly illustrates the rule. There, the parties settled the original lawsuit and the case was

dismissed with prejudice. 544 F.App'x at 64. The defendant then breached the settlement agreement and the plaintiff moved for injunctive relief and to hold the defendant in contempt. *Id*. The district court held it lacked subject-matter jurisdiction to decide the motions, and the Third Circuit affirmed, holding that the new injunctive relief sought by the plaintiff was "more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Id*. at 66. Numerous other cases follow this reasoning. For example, in *Arkansas Blue Cross & Blue Shield v. Little Rock Cardiology Clinic*, 551 F.3d 812 (8th Cir. 2009) the District Court initially retained jurisdiction, then dissolved the injunction. When a party came back to the District Court seeking new relief, the District Court held, and the Eighth Circuit affirmed, that subject-matter jurisdiction had to be re-established. *See also*, *e.g.*, *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1018 (9th Cir. 2007) (same); *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994) (same); *Scelsa v. City Univ. of N.Y.*, 76 F.3d 37, 40 (2d Cir. 1996) (district court did not retain subject-matter jurisdiction and therefore jurisdiction must be re-established before it could hear new motion for injunction).

When it ruled it had subject-matter jurisdiction, the Court did not engage in this analysis. Instead, it asserted that it had subject-matter jurisdiction in 2001 "based on the Court's inherent power to enforce its decisions." Ex. T 29. In doing so, it relied on two cases involving a court's authority to enter or maintain an injunction *where that court has expressly retained jurisdiction over the case*. *In re Linerboard Antitrust Litig.*, 361 F. App'x 392, 397 (3d Cir. 2008) (because district court had "expressly retained jurisdiction," subject-matter jurisdiction was present for entry of anti-suit injunction); *Karaha Bodas Co. v. Perusahaan*, 500 F.3d 111, 129 (2d Cir. 2007) (district court properly exercised continuing jurisdiction over permanent injunction). The District Court's reliance on a third case, *Gambone v. Lite Rock Drywall*, 288 F. App'x 9 (3d Cir.

2008) likewise was misplaced. That case concerns only a "post-judgment enforcement proceeding, which is a proceeding that functions as a means for executing a judgment," such as a proceeding for garnishment. 288 F. App'x at 12.

None of those cases applies because, as noted, the case filed by AJA in 1991 ended in 1997; the District Court (O'Neill, J.) did not retain jurisdiction then, and the 2001 proceedings were not proceedings on the execution of a judgment. Rather, the 2001 proceedings before Judge O'Neill concerned ACE's fresh attempts to enjoin AJA from enforcing a *different* judgment, the later-in-time 2000 Liberian Judgment. The 2001 proceedings therefore sought relief "of a different kind or on a different principle" than that obtained in the 1991 insurance coverage case, so subject-matter jurisdiction needed to be re-established. *Peacock*, 516 U.S. at 358; *Guiuan*, 544 F.App'x at 66.

## B. CIGNA was a merely nominal party; the real party was ACE, a foreign entity.

Because the Court did not have ancillary jurisdiction to decide CIGNA's injunction motion, an independent basis for subject-matter jurisdiction was needed. In other words, diversity jurisdiction needed to be re-established in 2001. In a diversity action, "a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980). A real party to the controversy must hold a "real and substantial" stake in and control over the suit. *Id*. at 464. In *Navarro*, the Supreme Court held that a trustee that controlled both the assets at issue and the litigation over them was the real party to the controversy. *Id*. at 465. In contrast, where a plaintiff is a "mere conduit" for a remedy flowing to others, it is merely a nominal party whose citizenship is not relevant for diversity purposes. *Id*.

The Courts of Appeals repeatedly have interpreted *Navarro* to mean that the real party to the controversy must have *both* a substantial stake in the litigation *and* exercise control over the litigation. *Broyles v. Bayless,* 878 F.2d 1400, 1403 (11th Cir.1989) ("a real party in interest is a party that has a real and substantial stake in the litigation and who exercises *substantial control* over the litigation") (emphasis in original, citing *Navarro*); *Johnson v. Smith Kline Beecham Corp.*, 724 F.3d 337, 358 (3d Cir. 2013) (federal court "can base its jurisdiction only upon the citizenship of the parties with a 'real interest in the litigation'"); *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 195 (2d Cir. 2003) (where multiple parties could have brought suit, "a strategic choice of parties in order to maintain diversity is not considered to be collusive so long as the party chosen to bring the suit is in fact the master of the litigation*").

Here, the record shows that ACE had total control of CIGNA's Liberian runoff business and the litigation over it. Thus, under *Navarro* and numerous decisions of the Courts of Appeals, ACE was the real party, and CIGNA merely a nominal party. The Third Circuit's opinion in *Johnson*, affirming this Court, explains this principle. In that case, a Pennsylvania corporation that had sold allegedly defective products converted into a Delaware LLC that took over all of the corporation's "debts, liabilities, and duties." *Id*. at 359. The Pennsylvania corporation was not diverse with plaintiffs, leading plaintiffs to seek remand to state court on the grounds that the Pennsylvania corporation was a real party to the controversy. *Id*. at 340. Under Pennsylvania law, the corporation could still be sued even though the new Delaware company, which was diverse, had assumed the liabilities. *Id*. at 358. Nevertheless, this Court refused to remand the case, and was affirmed by the Third Circuit, which held that because the Pennsylvania corporation no longer had any "actual interest in the outcome of the litigation," it was merely a

"nominal party" whose citizenship should be disregarded in favor of its successor's citizenship. 952 F.2d at 359.

Numerous cases from other circuits are in accord. For example, in *Slater v. Republic-Vanguard Ins. Co.*, 650 F.3d 1132 (8th Cir. 2011), an insurance policyholder assigned her rights under the policy to another party. Like ACE here, in that case the assignee controlled the exercise of the rights it had been assigned. The original policyholder was therefore only a nominal party, and the assignee the real party. 650 F.3d at 1135. Likewise, in *Airlines Reporting Corp. v. S and N Travel, Inc.*, 58 F.3d 857 (2d Cir. 1995), a plaintiff corporation purported to bring suit on behalf of its shareholders, major airline carriers, who were not made parties to the case. *Id*. The nominal plaintiff was required by contract to transfer any amounts it recovered as damages to the carriers. *Id*. at 860. In essence, it was a frontman for the nonparty airline carriers. The Second Circuit held that the plaintiff's citizenship should not be considered when deciding discovery because it was "a mere conduit for a remedy owing to others, advancing no specific interest of its own." The carriers' citizenship was what mattered, and diversity was destroyed. *Id*. *See also*, *e.g.*, *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1089 (11th Cir. 2010) (members of underwriting syndicates were real parties in interest because they, not nominal-plaintiff lead underwriters, assumed the ultimate risk for insurance losses); *Strotek Corp. v. Air Transp. Ass'n of Am.*, 300 F.3d 1129, 1133 (9th Cir. 2002) (entity whose liability had been transferred to a different entity was not a real party to the controversy for jurisdictional analysis); *Broyles*, 878 F.2d at 1403 (insurer whose liability was contingent on other liability being established and whose participation in tort proceeding was "minimal" was merely a nominal party).

In analyzing this issue, the Court held that ACE did not need to be joined, because it was merely CIGNA's "indemnitor." Ex. T at 30. This is contrary to the uncontested facts in the record. ACE "assumed all liabilities and obligations of any kind or nature whatsoever, whether fixed, absolute, matured, unmatured, accrued, contingent, known or unknown" related to the Liberian business, and had an unfettered right to control the defense of those claims. Ex. C at 21; Ex. F at 85. With regard to the 2000 Liberia Judgment, ACE therefore stood in CIGNA's shoes for all purposes. It is plain that, from 2001 forward, CIGNA was simply doing ACE's bidding. This rendered CIGNA only a nominal party. ACE therefore must be deemed the real party to the controversy for determining diversity.

The "presence of aliens on both sides of the controversy defeats jurisdiction . . . under section 1332(a)(2)." *Dresser Indus.*, 106 F.3d at 499. With ACE on one side of the suit and AJA on the other, subject-matter jurisdiction did not exist in 2001 and does not exist today.

## IV. KENNEY AND OTHER RESPONDENTS WERE ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY, WHICH DEPRIVED THE COURT OF SUBJECT-MATTER JURISDICTION.

In addition to the lack of diversity jurisdiction, the Court lacked subject-matter jurisdiction because of sovereign immunity. *In re Terrorist Attacks on September 11, 2001*, 122 F. Supp. 3d 181, 185 (S.D.N.Y. 2015) (common-law sovereign immunity deprives the district court of subject-matter jurisdiction); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 11 (D.D.C. 2014) (same). The existence of sovereign immunity should have ended the contempt case ahead of the Orders being entered, because it left the Court "without jurisdiction over the action just as it would be in a case filed in federal district court under 28 U.S.C. § 1332 that did not have diverse parties, or one filed under 28 U.S.C. § 1331 absent a claim arising under federal law." *Security Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 284 (9th Cir. 1989). And as with the lack of

diversity jurisdiction, the existence of sovereign immunity may be collaterally attacked in this criminal-contempt proceeding. *Providence Journal Co.*, 820 F.2d at 1347.

### A. The Commissioners enjoyed sovereign immunity for acts taken in their official capacities, and Kenney along with them.

Kenney began representing the Commissioner on April 25, 2007, the day after the Commissioner was appointed by the Liberian Civil Law Court as Receiver of CIGNA's Liberian branch. *See* Ex. F at ¶ 21. After receiving and recognizing proof of claims against CIGNA and identifying the appropriate forum for litigation, the Commissioner filed the "Cayman Action." R422–23. Acting as his attorney, Kenney assisted the Receiver in preparing and filing the Cayman Action. The Cayman Action caused CIGNA to file its initial contempt motion (which named the Commissioner and Lohman) in November 2008, and precipitated the next nine years of litigation culminating in the Orders leading to this prosecution.

After the first appeal in 2011, and at the request of the State Department, the Department of Justice, Civil Division, issued a Statement of Interest to the Court. Ex. Q. In its Statement of Interest, the Justice Department (relaying the conclusion of the State Department) concluded that the Commissioner was entitled to immunity:

> to the extent the Court finds that the acts for which CIGNA seeks to hold them in contempt—namely, recognizing AJA's proof of claim based on its Liberian judgment and initiating and continuing the indemnity suit in the Cayman Islands against ACE—were, *under Liberian law*, acts taken by Senesie and Sesay in their official capacities as Insurance Commissioners for the Republic of Liberia.

Ex. Q at 14.

The State and Justice Departments thus recognized the primacy of Liberian law in determining the Commissioner's immunity. They further "recognize[d] that *Liberian law* may treat acts taken in the Insurance Commissioner's capacity as [Receiver] taken in his official

activity," and therefore cloak the Receivers in immunity.  As the State and Justice Departments also recognized, Kenney, their attorney, would also be entitled to sovereign immunity for acts done in his representation of them.  *Id.* at 14–15[9]; *see also Heaney v. Spain*, 445 F.2d 501, 504 (2d Cir. 1971) ("the immunity of a foreign state extends to any other 'official or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state'") (quoting Restatement (Second) of Foreign Relations Law § 66(f) (1965)).

### B.    The Commissioners acted in their official capacities under Liberian law.

After the State Department issued its opinion, the Liberian Civil Law Court issued a ruling that carefully parsed Liberian Insurance Law and held that the Commissioner/Receivers were, at all relevant times, acting in their official capacities.  Ex. Q.  Weighing multiple factors, including that only the Commissioner of Insurance of Liberia can be appointed Receiver over the local affairs of a delinquent alien insurer and only by court order, and that the Commissioner is required to apply his official seal to all documents issued by him while acting as a receiver, the Liberian court concluded that the roles of Commissioner and Receiver were "inextricably interrelated" and that the Commissioner/Receiver therefore "acts as a public or state official when carrying out his duties as receiver of a delinquent alien insurer."  *Id.* at 4–5.

The Liberian Embassy later confirmed the Republic of Liberia's position that Senesie and Sesay were entitled to sovereign immunity, because they had been sued "in respect of activities undertaken by them in furtherance of their Liberian statutory and court-mandated duties."  Ex. EE at 1.

---

[9] The Statement of Interest refers only to Lohman, who was the only contempt respondent at the time. But its conclusions should apply equally to Kenney, who, like Lohman, represented the Receivers from April 25, 2007 in their pursuit of the Cayman Action.

A Liberian law expert, Oswald Tweh, reached the same conclusion, finding that, "under the law of Liberia, the … Receiver over the licensed Liberian branch and business of CIGNA WW, is acting in his capacity as an independent officeholder and as the principal regulator of insurance companies." Ex. FF at 10.

As the State Department noted, the views of a foreign state on its officials' immunity as well as the written law of the foreign state are the primary authorities worth consulting in determining whether a foreign official acts in his official capacity. Ex. Q at 13–14. The State Department's view is consistent with Federal Rule of Civil Procedure 44.1, which allows district courts to consider any relevant material or source for foreign law, whether or not admissible. As such, the opinions of a Liberian court, the Liberian Embassy, and a Liberian law expert should have carried great weight in the civil case, especially because no contradicting view of Liberian law was ever offered.

### C. The Court failed to consider Liberian law in deciding whether the Commissioners were acting in their official capacities.

The Court correctly accepted the Executive Branch's conclusion that the Commissioners were immune for their official actions. Ex. T at 33–34; *see also, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004) (when the State Department expresses its "opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy"). But from that correct conclusion the Court erred by ignoring the substance of the Executive's advice—that *Liberian* law is the arbiter of whether the Commissioners acted in their official capacities. The Court flatly dismissed the conclusions of the Liberian court, the Liberian Embassy, and a Liberian law expert as "untested 'evidence.'" Ex. T at 34.

Further, the Court did not analyze Liberian law for itself.  Instead, it relied on *American* receivership law.  *Id*. at 36.  Liberia, not the United States, has the authority to define the roles of Liberia's government officials, and it was error for the Court to discard unrebutted, reputable authority that the Receivers acted in their official capacities as Commissioner.  *See, e.g.*, *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 588 (2d Cir. 2005) (reversing district court judgment when it improperly refused to apply Korean law and instead imposed American law).

Because Liberian law treats acts taken in the Commissioners' capacities as Receiver as acts taken in their official capacities, the Commissioners are immune, and Kenney is derivatively immune with them.  Accordingly, the Court was without subject-matter jurisdiction when it entered the Order and the Court should now dismiss the criminal-contempt charges against Kenney for lack of jurisdiction in the civil contempt case.

### **CONCLUSION**

Defendant respectfully requests that the charges of criminal contempt be dismissed.

Dated:  March 29, 2017                              Respectfully submitted,

**MARTIN S. KENNEY**

By:  /s/ *Patrick J. Egan*
        One of His Attorneys
Patrick J. Egan
FOX ROTHSCHILD LLP
2000 Market Street, 10th Floor
Philadelphia, PA  19103
(215) 299-2000 (Phone)
(215) 299-2150 (Fax)
pegan@foxrothschild.com
wstassen@foxrothschild.com

## CERTIFICATE OF SERVICE

I certify that on March 29, 2017, a true and correct copy of the foregoing defendants

**MARTIN S. KENNEY'S MOTION TO DISMISS** was served by ECF upon the following:


          Daniel A. Velez
          Sarah T. Damiani
          United States Attorney's Office
          615 Chestnut Street
          One Independence Mall, Suite 1250
          Philadelphia, PA  19106-4476
          daniel.velez@usdoj.gov
          sarah.damiani@usdoj.gov


                    */s/ Patrick J. Egan*